UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOURABH KUMAR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>XL FLEET CORP., THOMAS J. HYNES III, DIMITRI KAZARINOFF, and JONATHAN J. LEDECKY,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Sourabh Kumar ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation conducted by and through Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by XL Fleet Corp. ("XL Fleet" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by XL Fleet; and (c) review of other publicly available information concerning XL Fleet.

## NATURE OF THE ACTION

1.        This is a class action on behalf of persons and entities that purchased or otherwise acquired XL Fleet securities between October 2, 2020 and March 2, 2021, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      XL Fleet provides vehicle electrification solutions for commercial and municipal fleets in North America.  The Company offers hybrid and plug-in hybrid electric drive systems.

3.      XL Fleet formed via merger of XL Hybrids, Inc. ("XL Hybrids") and Pivotal Investment Corporation II ("Pivotal"), which closed on or about December 22, 2020 (the "Merger").  Pivotal was a special purpose acquisition company incorporated for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or similar business combination with one or more businesses or entities.

4.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) XL Fleet's salespeople were pressured to inflate their sales pipelines to boost the Company's reported sales and backlog; (ii) at least eighteen of the thirty-three customers that XL featured were inactive and had not placed an order since 2019; (iii) XL's technology had been materially overstated and offered only 5% to 10% of fleet savings; (iv) XL lacks the supply chain and engineers to roll out new products on the announced timelines; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

5.      On March 3, 2021, Muddy Waters Research ("Muddy Waters") published a report entitled "XL Fleet Corp. (NYSE: XL): More SPAC Trash," alleging, among other things, that salespeople "were pressured to inflate their sales pipelines materially in order to mislead XL's board and investors" and that "customer reorder rates are in reality quite low" due to "poor performance and regulatory issues."  Citing interviews with former employees, the report alleged that "at least 18 of 33 customers XL featured were inactive."  Muddy Waters also claimed that XL

Fleet has "weak technology" and that "XL's announcement of future class 7-8 upfits seems highly promotional" because the task is "too technologically complex for XL engineers to deliver on the promised timeline."

6.      On this news, the Company's share price fell $2.09 per share, or 13%, to close at $13.86 per share on March 3, 2021, on unusually heavy trading volume.  The share price continued to decline by $2.69 per share, or 19.4%, over two consecutive trading sessions to close at $11.17 per share on March 5, 2021, on unusually heavy trading volume.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased XL Fleet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant XL Fleet is incorporated under the laws of Delaware with its principal executive offices located in Boston, Massachusetts.  XL Fleet's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "XL."

14.     Defendant Thomas J. Hynes III ("Hynes") is the founder of XL Hybrids.  He served as Chief Strategy Officer of XL Hybrids and has been the President of XL Fleet following the Merger.

15.     Defendant Dimitri Kazarinoff ("Kazarinoff") was the Chief Executive Officer ("CEO") of XL Hybrids and became CEO of XL Fleet following the Merger.

16.     Defendant Jonathan J. Ledecky ("Ledecky") was the Chairman and CEO of Pivotal at all relevant times.

17.     Defendants Hynes, Kazarinoff, and Ledecky (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    XL Fleet provides vehicle electrification solutions for commercial and municipal fleets in North America. The Company offers hybrid and plug-in hybrid electric drive systems.

19.    XL Fleet formed via merger of XL Hybrids and Pivotal, which closed on or about December 22, 2020. Pivotal was a special purpose acquisition company incorporated for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or similar business combination with one or more businesses or entities.

### Materially False and Misleading Statements Issued During the Class Period

20.    The Class Period begins on October 2, 2020, when Pivotal filed its registration statement on Form S-4 seeking shareholder approval of the Merger (the "Registration Statement"). Therein, Pivotal included the following financial information for XL Hybrids:

**XL's Selected Financial Information**
(dollars in thousands except per share amounts)

**Statement of Income Data:**

| | For the six months ended June 30, | | For the year ended December 31, | |
|---|---|---|---|---|
| | **2020** | **2019** | **2019** | **2018** |
| | (unaudited) | | | |
| Revenues | $ 3,144 | $ 4,343 | $ 7,215 | $ 9,545 |
| Cost of revenues | 3,152 | 4,505 | 8,075 | 11,014 |
| Gross profit | (8) | (162) | (860) | (1,469) |
| Research and development | 1,651 | 7,232 | 4,721 | 2,101 |
| Selling, general, and administrative expenses | 5,494 | 4,353 | 7,988 | 9,125 |
| Interest expense | 1,668 | 217 | 2,151 | (208) |
| Change in fair value of derivative | 4,537 | — | (819) | — |
| Loss on extinguishment of debt | 1,038 | — | — | — |
| Net and comprehensive loss | (14,396) | (5,964) | (14,901) | (12,903) |

21. Regarding XL Hybrids' customers, the Registration Statement stated, in relevant part:

> *XL relies on a limited number of customers for a large portion of its revenues, and the loss of one or more such customers could have a material adverse impact on its business, financial condition and results of operations.*
>
> XL depends on a limited number of customers for a significant portion of its revenue. For the fiscal year ended December 31, 2019, XL had two customers that each accounted for over 10% of its revenue. In the aggregate, these customers accounted to 69% of XL's revenue for the fiscal year ended December 31, 2019. The loss of one or more of these customers could have a significant impact on XL's revenues and harm its business, results of operations and cash flows.

22. Regarding the development of new technology, the Registration Statement stated, in relevant part:

> *XL may experience significant delays in the design, production and launch of its electrified powertrain solutions, which could harm its business, prospects, financial condition and operating results.*
>
> Any delay in the financing, design, production and launch of XL's electrified powertrain solutions could materially damage XL's brand, business, prospects, financial condition and operating results. There are often delays in the design, production and commercial release of new products, and to the extent XL delays the launch of its electrified powertrain solutions, its growth prospects could be adversely affected as it may fail to grow its market share. XL integrates electrified solutions into original equipment manufacturer ("OEM") vehicles, and if the OEM makes unexpected changes to the function of the vehicle, this could significantly delay the development and therefore launch of XL's electrified powertrain solutions. XL will rely on upfitter partners to install XL's electrified powertrain

solution, and if they are not able to produce product at scale or meet XL's specifications, XL may need to expand its production capabilities, which would cause XL to incur additional costs. Furthermore, XL relies on third-party suppliers for the provision and development of many of the key components and materials used in its electrified powertrain solutions, and to the extent they experience any delays, XL may need to seek alternative suppliers. If XL experiences delays by its suppliers, it could experience delays in delivering on its timelines.

23.     Regarding XL Hybrids' vehicle performance, the Registration Statement stated, in

relevant part:

> ***The performance characteristics of XL's electrified powertrain solutions, including fuel economy and emissions levels, may vary, including due to factors outside of its control.***
>
> The performance characteristics of XL's electrified powertrain solutions may vary due to factors outside of its control. External factors that may impact the performance characteristics include fuel economy and emissions levels. For instance, the estimated fuel savings and fuel economy of vehicles installed with XL's electrified powertrain solutions may vary depending on factors including, but not limited to, driver behavior, speed, terrain, hardware efficiency, payload, vehicle and weather conditions. In addition, GHG emissions of vehicles installed with XL's electrified powertrain solutions may also vary due to external factors, including the type of fuel, driver behavior, the efficiency and certification of the engine and where the engine is being operated. Additionally, the total emissions generated is subject to how the electricity used to charge XL's plug in products is generated, which is also outside of XL's control. These external factors, as well as any operation of XL's electrified powertrain solutions other than as intended, may result in emissions levels that are greater than XL expects. Due to these factors, there can be no guarantee that the operators of vehicles using XL's electrified powertrain solutions will realize the expected fuel savings and fuel economy and GHG emission reductions.

24.     The Registration Statement further disclosed that there were certain material

weaknesses in XL Hybrids' internal control over financial reporting.  Specifically, it stated:

> In the course of preparing the financial statements that are included in this proxy statement/prospectus, XL has identified a number of adjustments to its financial statements that resulted in a restatement of previously issued financial statements. In addition, XL has identified material weaknesses in internal control over financial reporting, which relate to insufficient technical accounting resources and lack of segregation of duties.

25.     On November 12, 2020, XL Fleet issued a press release announcing its third quarter

2020 financial results.  The Company stated:

> XL Fleet ("XL" or the "Company"), a leader in vehicle electrification solutions for commercial and municipal fleets, today announced that its revenue for the third quarter of 2020 was the highest for a single quarter in the Company's history.
>
> XL achieved record quarterly total GAAP revenue of $6.3 million for the third quarter of 2020. In comparison, XL achieved $2.6 million in revenue for the third quarter in 2019, and approximately $7.2 million in revenue for the full fiscal year ended December 31, 2019. The revenue increase was driven by continued product adoption across the Company's portfolio, which is currently comprised of XL's core hybrid and plug-in hybrid electric drivetrain business. The Company expanded margins that resulted in positive gross margins of 12.1% for the third quarter of 2020, as compared to negative (3.7%) for the third quarter of 2019.
>
> Due to strong year-to-date results, XL remains on track to deliver on its full year 2020 revenue forecast of approximately $21 million. XL continues to grow its sales opportunity pipeline for 2021 to $220 million as of today, which supports XL's current revenue forecast of $75 million for fiscal year 2021.

26.     On November 16, 2020, XL Fleet issued a press release entitled "XL Fleet Expands

XLPTM Plug-in Hybrid Electric Drive System For Use in Multiple GM Fleet Applications."

Therein, the Company stated, in relevant part:

> XL Fleet ("XL" or the "Company"), a leader in vehicle electrification solutions for commercial and municipal fleets, has announced that the Company's XLPTM plug-in hybrid electric drive technology is being expanded for use across a range of fleet vehicles from General Motors (NYSE: GM). The platform is expected to begin shipping on select configurations of the Chevrolet and GMC Silverado / Sierra 2500 HD and 3500 HD pickup trucks in the first quarter of 2021, and on Chevrolet and GMC 3500 and 4500 cutaway chassis in the second quarter of 2021.
>
> The Company's newest product offering expands its growing lineup of plug-in hybrid electric drive systems, which can improve fuel economy by increasing miles per gallon by up to 50% and reducing $CO_2$ emissions by approximately one-third compared to traditional gas-powered vehicles. It is also the Company's first plug-in hybrid system to be available for Chevrolet and GMC fleet vehicles, adding to a broad range of XL hybrid systems currently available for GM products.

27.     On November 23, 2020, XL Fleet issued a press release stating that it expected its

largest partner to double orders in 2021.  Specifically, the Company stated, in relevant part:

XL Fleet ("XL" or the "Company"), a leader in vehicle electrification solutions for commercial and municipal fleets, today announced that Farmbro Inc. ("Farmbro"), an Ontario-based upfitting solutions service provider specializing in commercial and work vehicles, expects to double its sales volume from approximately 1,000 XL unit installations in 2020 to over 2,000 in 2021 to meet the increasing demand for fleet electrification in Canada. As part of its expanding partnership, XL Fleet is recognizing Farmbro as its Sales and Installation Partner of the Year for 2020.

28.     On December 1, 2020, XL Fleet issued a press release announcing the launch of its

XL Grid Division with charging infrastructure solutions.  The Company stated:

XL Fleet (the "Company"), a leader in vehicle electrification solutions for commercial and municipal fleets, today announced that it has entered into a partnership with a commercial EVSE (electric vehicle supply equipment) supplier to begin the launch of its XL Grid division. XL Grid will provide charging infrastructure, energy storage and power solutions for electrified fleets. XL Fleet customers can now purchase XL Grid charging systems separately or as part of an order for vehicles with the Company's electrified powertrain.

XL Fleet currently has over 200 fleet customers across the U.S. and Canada and expects they will require at least 100,000 charging stations in the next several years based on their growing demand for electric vehicles. XL Fleet intends to continue expanding its XL Grid division to meet these energy demands. XL Grid will provide an innovative array of software, hardware and strategic partnerships to power a complete Electrification as a Service solution.

29.     On December 8, 2020, the Registration Statement, as amended in response to the

SEC's questions, was declared effective.

30.     On December 16, 2020, XL Fleet issued a press release announcing the expansion

of its electrification solutions portfolio to meet "strong customer demand."  The Company stated:

XL Fleet (the "Company"), a leader in vehicle electrification solutions for commercial and municipal fleets, today announced that it has expanded its line of electrified powertrains to include a hybrid electric drive system for the Class 5 Ford F-550 Super Duty chassis. The new system was developed and brought to market within six months to meet a significant and growing commercial fleet demand for the electrified F-550 chassis, for applications including municipal transportation, utilities, construction equipment and customer service vehicles.

The F-550 vehicles will be upfit with XL Fleet's hybrid electric drive system and begin deliveries to customers by the end of 2020. Vehicles equipped with XL Fleet's hybrid electric drive system have been proven to significantly improve fuel

economy while reducing greenhouse gas emissions – a key aspect of meeting fleet sustainability goals.

31.     The above statements identified in ¶¶ 20-28 and 30 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors that: (i) XL Fleet's salespeople were pressured to inflate their sales pipelines to boost the Company's reported sales and backlog; (ii) at least eighteen of the thirty-three customers that XL featured were inactive and had not placed an order since 2019; (iii) XL's technology had been materially overstated and offered only 5% to 10% of fleet savings; (iv) XL lacks the supply chain and engineers to roll out new products on the announced timeline; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## The Truth Emerges

32.     On March 3, 2021, Muddy Waters published a report entitled "XL Fleet Corp. (NYSE: XL): More SPAC Trash," alleging, among other things, that salespeople "were pressured to inflate their sales pipelines materially in order to mislead XL's board and investors" and that "customer reorder rates are in reality quite low" due to "poor performance and regulatory issues." Citing interviews with former employees, the report alleged that "at least 18 of 33 customers XL featured were inactive."  The report stated, in relevant part:

> XL MANAGEMENT SYSTEMATICALLY INFLATES THE COMPANY'S BACKLOG
>
> XL claims a backlog of $220+ million. This number is key to XL's sales projections, appearing twice in XL's SPAC slide deck. However, our conversations with former employees suggest XL's "pipeline" is a fiction created under pressure from senior managers. We understand that the rot emanates from XL management, who further embellished their employees' already exaggerated pipeline entries.

* * *

XL'S CLAIMED CUSTOMER BASE APPEARS GROSSLY OVERSTATED

Below is XL's stated customer list, which includes 33 logos.[] Former employees told us that many of these had not ordered vehicles for a long time. In a March 2, 2021 appearance on CNBC with Jim Cramer, XL CEO Tod Hynes deflected a question about whether its customers include some of the names below.



* * *

WE UNDERSTAND FROM FORMER EMPLOYEES THAT AT LEAST 18 OF 33 CUSTOMERS XL FEATURED WERE INACTIVE

The list shrinks by over half after removing reportedly inactive customers:



* * *

NUMEROUS XL CUSTOMERS REPORTEDLY HAVE NOT REORDERED DUE TO POOR PERFORMANCE AND REGULATORY ISSUES

We believe that XL's high customer attrition rate stems from XL's lack of engineering edge, its misleading efficiency claims, and its substantial issues with regulatory approval. [footnote omitted]

"*Almost no one reorders... it's maybe 10%. To get your order in the first place, it's a months and months wait, you're angry, and then the thing doesn't work as promised. '6% improvement for $15,000? We're not going to buy any more of these things.'*" – Former XL Employee A

(Emphasis in original.)

33.    Muddy Waters also alleged that while XL Fleet "claims that its technologies leads to 25%+ MPG gains," in reality "fleet savings are generally only 5% to 10%, and are sometimes negative."  Specifically, it stated:

XL SEEMINGLY DOES NOT ACHIEVE STATED MPG GAINS OR GENERATE CLAIMED ROIs FOR CUSTOMERS

There are two elements to XL's misrepresentations to its customers – exaggerated mileage gains and aggressive ROI modeling assumptions. Based on our conversations with former XL employees, we conclude that the company's technology seldom – if ever – generates the advertised 25-50% fuel savings. We estimate the savings is really only 5% - 10%. Three former employees told us that they were instructed to cherry-pick customer information from XL's quarterly performance reports in order to exaggerate the technology's effectiveness, while blaming inadequate MPG savings on the customers' drivers. Similar to the fuel efficiency exaggeration, XL appears to routinely pad ROI calculations to prospective customers. We believe that XL inflates ROIs primarily by using unrealistically high gas prices and vehicle service life. We believe that the actual ROI XL's customers generate on average is *NEGATIVE*.

* * *

WE UNDERSTAND THAT FLEET-WIDE SAVINGS ARE GENERALLY ONLY 5% to 10%, AND ARE SOMETIMES NEGATIVE

Reality seems to fall well short of what XL claims. We understand that fleets generally received only 5- 10% MPG efficiency gains and negative ROI.

"*Their numbers are based upon a bare-boned F-150 on a dyno [dynamometer] in optimal, optimal circumstances, but the second you add weight or a passenger or human error to that, it all goes out the window.*" – Former XL Employee A

12

*"The things that it doesn't cover is climbing hills; the simulation is all flat... Every time you take a turn, you're expending energy to make that turn. Those are real-world situations it doesn't simulate."* – Former XL Employee F

*"If you were in the exact drive cycle that was optimal for those vehicles, a city drive cycle with very much stop and go and little idling, you did get 25%. But that drive cycle was applicable to probably 15% of vehicles that they installed systems on. If you were purchasing a system and weren't in that city drive cycle, your savings were ... Probably between 5 - 10%... definitely not 25%."* – Former XL Employee I

*"It's like a Formula One circuit; you're cornering these turns and trying to optimize the levels of throttle and brake. You try to make sure during your throttle up that you take as much power from the hybrid battery pack as possible. You start this drive when a full battery... A lot of the parameters don't really match what you'd see in a real road scenario."* – Former XL Employee G

## XL'S PLUG-IN HYBRID ALSO SIGNIFICANTLY UNDERPERFORMS XL'S EFFICIENCY CLAIMS

XL's underperformance applies not only to its conventional hybrid product, but extends to its newer plugin hybrid as well.

*"The [plug-in hybrid] ones they did have out, they claimed a 50% increase in miles per gallon, the most any of them got were 35-40%.... average was 25-35%."* – Former XL Employee B

*"Never would you come across 50% on the plug-in... The 50%, it's insane that it's advertised... You might see a decrease in MPG because you're adding 800 pounds of batteries to the back of an F-150 and expecting it to achieve performance."* – Former XL Employee A

## XL CHERRY-PICKED DATA AND BLAMED MPG MISSES ON DRIVERS

We found that XL encouraged its employees to present a highly manipulated set of metrics to customers to demonstrate MPG savings; or, barring that, XL employees blamed fleet drivers for not understanding the technology.

*"I gave dozens of... presentations to fleet managers, generated out of XL Link, the onboard telematics system in each vehicle with XL technology. What this report indicates, is either no improvement in MPG, slight improvement in MPG, or a loss of overall MPG. Keep in mind these kits are $25,000 each, add 750 lbs of curb weight, and take up very valuable bed space, and advertise up to 50% improvement. I would highlight their drivers' errors, such as idle time, driving over the ideal speed, and aggressive acceleration habits, just to assign blame elsewhere for no*

*improvement in MPG. ==I would also falsify their fuel cost per gallon==, behind what's visible to the customer, to try and prove some ROI."* — XL Former Employee A

*"My customers that had the system wanted access to XL Link. But... salespeople had to give them presentations because they tried to pretty it up to avoid, "Hey, you're only getting another mile per gallon and it's not what we promised." ==They would never let the customer have access to the raw data on that:== we had to put it into a presentation to give to them."* — Former XL Employee B

(Emphases in original.)

34.    Muddy Waters also claimed that XL has "weak technology" and that "XL's announcement of future class 7-8 upfits seems highly promotional" because the task is "too technologically complex for XL engineers to deliver on the promised timeline." Specifically, the report stated, in relevant part:

XL LACKS THE SUPPLY CHAIN AND PROPRIETARY TECHNOLOGY FOR EFFECTIVE FULL ELECTRIFICATION

Since XL has outsourced the manufacturing of almost all its components, this seemingly makes it substantially more difficult for it to design full-EV upfits, which are more complicated and costly.

*"XL was not vertically integrated at all, most everything was outsourced, so, it'd be very difficult for me to see them having the core competencies to develop a full EV... It's not like XL is going to crack the code on that; many have tried and few have succeeded. I am very bearish on their ability to do that."* — Former XL Employee D

*"I think any company of that kind of size that's not building full vehicles would have a hard time competing with Ford... if they had experience like Tesla did or something, that would be a different story."* – Former XL Employee F

*"There's a lot of people making those moves [into EV] right now. There's some pretty fierce competition that will lead to some interesting tech. As an installer, I think that's good. Does XL have something of true value, a patent on something? I can say, probably not... I don't see a meaningful reason why XL will be around in ten years. But in the meantime, they're there and I use them."* – Current XL Upfitter

*"One of their main flaws is the way the systems are assembled—they have all these parts they handassemble at a small facility in Illinois... It's cute when Harvard is in your backyard and you want to deliver them a van, but the process they have right now is not scalable."* — Former XL Employee C

* * *

## XL'S ANNOUNCEMENT OF FUTURE CLASS 7-8 UPFITS SEEMS HIGHLY PROMOTIONAL

In its revenue projections, which we view as extremely aggressive, XL has stated it intends to create hybrid and EV upfits for vehicles that are much heavier than the ones it has historically serviced. This is a task that former employees described flatly as too technologically complex for XL engineers to deliver on the promised timeline, which starts as soon as late 2021:

*"You need a large enough electric motor to help propel that vehicle, and for that, you need a larger battery. Soon enough, the battery becomes heavier than the vehicle... They really lose it in those plug-in pickup trucks. It works okay for the [Ford] Transits because they're lightweight anyway, but once you start getting to your pickup trucks, any weight past the stock factory body, your numbers go to shit."* – Former XL Employee A

*"Electrification does get more difficult the larger the vehicle. It's not that the ability isn't there, because the EV possesses a lot of torque, providing the ability to get the weight moving. It's the amount of energy that is required to move that much weight. That is why companies like Nikola are looking at hydrogen fuel cell technology over straight electric."* – Former XL Employee B

*"Electrification of semis is not a good choice today because you need a huge battery with 600-800 kWh, which even at very, very low prices is approximately 100-150% of the base cost of a Class 8 truck."* – EV Industry Employee

## XL'S EV/HYBRID GARBAGE TRUCK APPEARS TO BE A DISTRACTION WITH LIMITED POTENTIAL

Despite the severe limitations of the XL platform, XL has announced it intends to make hybrid and EV garbage trucks. We believe this announcement is promotional rather than promising, since refuse trucks are some of the least suitable vehicles to EV-upfit due to their immense weight and highly variable route lengths. [footnote omitted]

*"For garbage trucks, it will never work with the path they have to take and the payload they take... Refuse trucks are built for payload, because they want the truck to run as long as possible because of transfer station cost, mileage, etc. This means a truck with the same payload capacity has very different travel distances based on how long a route needs to be prior to full payload capacity... Refuse trucks have a lot more bells and whistles that will need electricity / power at all times, not just when the vehicle is moving. They include hydraulic systems, internal PLCs and controls, safety / camera equipment, etc."* – Former XL Employee G

*"I think they're probably trying to find a niche. School buses are done [by competitors]. Box trucks are done."* – Former XL Employee A

35.     On this news, the Company's share price fell $2.09 per share, or 13%, to close at $13.86 per share on March 3, 2021, on unusually heavy trading volume.  The share price continued to decline by $2.69 per share, or 19.4%, over two consecutive trading sessions to close at $11.17 per share on March 5, 2021, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired XL Fleet securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, XL Fleet's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of XL Fleet shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by XL Fleet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of XL Fleet; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

42.     The market for XL Fleet's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures

p

to disclose, XL Fleet's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired XL Fleet's securities relying upon the integrity of the market price of the Company's securities and market information relating to XL Fleet, and have been damaged thereby.

43.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of XL Fleet's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about XL Fleet's business, operations, and prospects as alleged herein.

44.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about XL Fleet's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased XL Fleet's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

47.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding XL Fleet, their control over, and/or receipt and/or modification of XL Fleet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning XL Fleet, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE
(FRAUD-ON-THE-MARKET DOCTRINE)**

48.     The market for XL Fleet's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, XL Fleet's securities traded at artificially inflated prices during the Class Period.  On

December 23, 2020, the Company's share price closed at a Class Period high of $32.59 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of XL Fleet's securities and market information relating to XL Fleet, and have been damaged thereby.

49.     During the Class Period, the artificial inflation of XL Fleet's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about XL Fleet's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of XL Fleet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50.     At all relevant times, the market for XL Fleet's securities was an efficient market for the following reasons, among others:

(a)     XL Fleet shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, XL Fleet filed periodic public reports with the SEC and/or the NYSE;

(c)     XL Fleet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     XL Fleet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for XL Fleet's securities promptly digested current information regarding XL Fleet from all publicly available sources and reflected such information in XL Fleet's share price.  Under these circumstances, all purchasers of XL Fleet's securities during the Class Period suffered similar injury through their purchase of XL Fleet's securities at artificially inflated prices and a presumption of reliance applies.

52.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

53.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of XL Fleet who knew that the statement was false when made.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

54.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase XL Fleet's securities at artificially inflated prices.   In

furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

56.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for XL Fleet's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about XL Fleet's financial well-being and prospects, as specified herein.

58.     Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of XL Fleet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about XL Fleet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

59.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

60.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing XL Fleet's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of XL Fleet's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired XL Fleet's securities during the Class Period at artificially high prices and were damaged thereby.

62.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that XL Fleet was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their XL Fleet securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

63.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of The Exchange Act Against the Individual Defendants)**

65.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of XL Fleet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

68.     As set forth above, the Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 12, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Monday, March 8, 2021

## XL Fleet Corp. (XL)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against XL Fleet Corp. ("XL Fleet" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire XL Fleet securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired XL Fleet securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  The attached sheet lists all of my transactions in XL Fleet securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.


**Name**

**Print Name**
SOURABH KUMAR

**Signature**

**XL Fleet Corp. (XL)**                                                    **Kumar, Sourabh**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/29/2021 | 200 | $21.8699 |